Treat, C. J. This was an action of ejectment brought by Tesson and Rankin against Ballance, to recover a lot of ground in the city of Peoria, covered by French claim thirty-three. On the trial, the plaintiff introduced the. following evidence : 1. The act of Congress, of the 15th of May, 1820, entitled, “ An act for the relief of the inhabitants of the village of Peoria,- in the State of Illinois.” 2. The act of Congress of the third of March, 1823, entitled, “An act to confirm certain claims to lots in the village of Peoria, in the State of Illinois.” These two acts are set forth at large in the case of Ballance v. McFadden, reported ante 317. 3. A patent from the United States, dated the 29th of June, 1846. It recited, that the claim of Antoine Roi, was enteredtin the report of the register of the Land Office, at Edwardsville, made on the 10th of November, 1820, pursuant .to the provisions of the act-of the 15th of May, 1820, as number thirty-three; that Roi was the settler and inhabitant, within, the purview of the act of the 3rd of' March, 1823; and it then proceeded; to grant the lot, as designated and surveyed according to the 2d section of that act, to “ the legal representatives of the said Antoine Roi, and to their heirs.” 4. The deposition of Madeline Glodon, showing that Antoine Roi died about thirty years ago, leaving Mary Roi, since intermarried with Toussant Gendron, his only descendant. 5. Á power of attorney, from Gendron and wife, to Narcisse Pensoneau, dated the 3rd of March, 18.49, authorizing him to sell and convey the lot in question. 6. A deed from Gendron and wife, by their attorney, in fact, Pensoneau, to the plaintiffs, dated the 20th of June, 1849, for the same premises. 7. A certified copy of the plat and survey of the French claims, in Peoria, approved the 1st of September, 1840. The defendant introduced the following evidence. I. A certificate of the register of the Land Office, at Quincy, showing that the defendant, on the 28th of July, 1832, established a right of pre-emption to the south west quarter of section nine, township eight north, of range eight east, which tract embraces the premises in controversy. 2. A certificate of the same officer, showing that the defendant entered the quarter section, on the 29th of November, 1837. 3. A patent from the United States to the defendant, for the same tract, dated the 24th of January, 1838, and containing this clause: “ subject, however, to the right of any and all persons claiming under the act of Congress of 3rd of March, 1823, entitled, “, An act to confirm certain claims to lots in the village of Peoria, in the State of Illinois.” He then offered in evidence, a judgment of the Peoria Circuit Court, of the May term, 1846, against certain real estate on which taxes were due and unpaid, for the year 1845, amongst which were 105 acres of the quarter section before described ; also, a precept issued on the judgment, directed to the Sheriff of Peoria county, dated the 10th of June, 1846; and a deed from the Sheriff to the defendant, dated the 10th of November, 1850, showing a sale to the defendant, on the 16th of June, 1846, of nine acres off’ of the east side of the 105 acres, and including the premises in dispute, for the amount of the taxes and costs. This evidence was rejected. The claim in question was thus described in the report of the register of the Land Office, at Edwardsville. “No. 33. Antoine Roi, claims a lot in Peoria, containing about one half of an arpent of land, and bounded northwardly by a lot of Charles Le Donb, eastwardly by a street separating it from the Illinois river, southwardly by unoccupied land, and westwardly by a street.” The plaintiffs had a verdict, and judgment for the premises demanded. Has the defendant the better legal title to the premises in controvesy ? If so, he must prevail in the action of ejectment. The equities of the parties cannot be adjusted in this proceeding. His entry, in 1837, was not in terms made subject to any rights acquired under the act of Congress of the 3d of March, 1823. The condition to that effect in the patent issued to him in 1838, appears to have been then for the first time imposed. The persons whose claims were confirmed by the act of 1823, did not acquire the legal title anterior to the approval of the survey in 1840. It was not the design of Congress to vest the title absolutely in the claimants, before the survey of the claims should be made and approved. The defendant, therefore, has the elder legal title, unless that part of the quarter section covered by the confirmed claims, was in effect appropriated, or reserved from sale, by the act of 1823. We are inclined to the opinion, that so much of the land within the ancient village of Peoria, as was confirmed to the settlers and inhabitants by the act of 1823, was, by the terms of that act, necessarily withdrawn from sale, or further appropriation; and consequently, that the defendant acquired no title as against the claimants, or their legal representatives, by virtue of his pre-emption and subsequent entry. The lots claimed were, by the provisions of that act, set apart and appropriated to a particular purpose. They were thereby severed from the mass of the public lands. They ceased to be the subject matter of public sale, or private entry. The act of the 15th of May, 1820, required all persons claiming lots in the village of Peoria, to give notice of their claims to the register of the land office at Edwardsville by the 1st of October thereafter; and it was made the duty of the register to report to the secretary of the treasury, the claims so presented, and the substance of the evidence adduced in their support; and his report was to be laid before Congress for consideration. Various claims were presented to the register, and by him reported in detail. The lots claimed were specifically described, so that their precise locality could be ascertained by a survey. The size of the lots and their boundaries were generally given. Such was the case with the claim in question. The act of the 3d of Mareh, 1823, with certain qualifications and restrictions not material to be now noticed, confirmed the claims contained in the report of the register ; and directed the surveyor general uto cause a survey to be made of the several lots, and to designate on a plat thereof the lot set apart and confirmed to each claimant, and forward the same to the secretary of the treasury ;” who was required to “ cause patents to be issued to such claimants as in other cases.” This action of Congress clearly amounted to an appropriation of the lots claimed by the settlers. It was a reservation of them from sale, or any further appropriation, by necessary implication. The lots were granted to the claimants. Nothing remained to be done to render the grant operative and effectual but the survey. And on the approval of the survey, the title eo instanii passed to the claimants, or to their legal representatives. In. the interval of time between the passage of the confirmatory act, and the survey of the lots pursuant to its provisions, no person could acquire a valid title as against the claimants. The claims confirmed were not of a floating or uncertain character. A survey alone was required to give them a fixed and determinate locality; and the means of making the survey were contained in the confirmatory act, and in the report of the register to which it referred, and on -which it was based. The claimants were to have no further agency in the location of their claims. They had already given them a definite location, by their improvements, and by the description of them in their notice of claims- to the register. But it was insisted on the argument, that there was no such reservation or appropriation of these lots, as to be binding on subsequent purchases from the government; and the case of Menard’s Heirs v. Massey, 8 Howard, 293, was relied on as supporting the position. In that case, Cerre, in 1799, obtained an unsurveyed concession from the Lieutenant Governor of Hpper Louisiana, for thirty-five hundred and twenty-eight arpens of land, 11 on the big spring of the river Maramee, so as to include said spring;” and, in 1806, he exhibited his claim for the same premises to the board of commissioners for confirmation. An act of Congress of the 3d of March, 1811, declared that “ no tract of land shall be offered for sale, the claim to which has been, in due time, and according to law, presented to the recorder of land titles in the District of Louisiana, and filed in his office, for the purpose of being investigated by the commissioners appointed for ascertaining the right of persons claiming lands in the Territory of Louisiana.” The township including “ the big spring of the river Maramee,” was offered for sale in 1823, and sold. In 1833, the commissioners reported that the claim of Oerre ought to be confirmed; and, in 1836, Congress confirmed the claim according to the report. A controversy then arose between the representatives of the claimant and the purchasers at the sale. The Court held that the purchasers had the superior title; and in answer to the position, that the land was reserved from sale by the act of 1811, said •„ “ In reserving lands from sale, it was necessary to know where they were situated, and how far they interfered with the public surveys. Either the President, or some other officer, must have had the power to designate the lands as those adjoining to salt springs and lead mines; or it must have appeared in some public office appertaining to the land Department what the boundaries of reserved lands were; and if it did not appear, no notice of the claim could be taken by the surveyors, nor by the registers and receivers when making sales. This was a conclusion that has from necessity been acted on at the land offices; and as Cerre’s claim was not surveyed before the confirmation took place, no boundaries of his tract could be recognized when the public surveys were made and the lands sold. He claimed no tract of land. The laws refer to specific tracts that are claimed ; it is not material whether the boundaries are proper, and according to the concession, or the claim be just or otherwise, so that the tract claimed be certain. This was also decided in the cases just cited. Certainly, a mere floating claim, founded on a concession that was ordered to be located by survey, and where no survey or location had been made, was not protected by the act of 1811. An actual survey is not indispensable; but boundaries must appear, in some form, from the notice of claim, and the accompanying evidences filed with the recorder. E¡ from these, the tract of land could not be laid down on the township surveys, then the land could not be reserved from sale; although by the concession, and by the notice, a particular spot, ( as the big spring of the Maramee,) was referred to in general terms as the place where the land should lie.” That case was, without doubt, rightly decided. The land claimed was described in so loose and indefinite a manner, that it could not be considered as withheld from sale. A surveyor could not have located it from the description given in the concession, or in the claim afterwards presented to the commissioners. It required some further act of the party, to give the tract claimed a definite form and location. But the case was widely different with these French claims. The lots were situated within the limits of the village of Peoria, a well known locality. They had been occupied and improved by the claimants. Their extent and boundaries were stated, from which the exterior lines could be easily ascertained. There could be but little difficulty in determining their precise locality. Was the land covered by their claims subject to taxation for the year 1845 ? This presents the question, when the title vested in the claimants. We answer, on the approval of the survey in September, 1840. The grant then became operative and complete. The confirmees, or their legal representatives, were from that time invested with the full legal estate in the lots as surveyed. The issuing of patents was not necessary to transfer the titles. It had already passed out of the United States. The patents are but evidence of title in the patentees. The law is well settled, that the government may make a perfect grant directly, and without the issuing of a patent, or any other evidence of title. An act of Congress, containing provisions clearly indicating an intention to pass the fee unconditionally and absolutely, operates ipso facto to vest the title in the grantee. A reference to one or two adjudged cases in the Supreme Court of the United States, upon grants made by the government, will fully establish this position. In Geignon’s Lessee v. Astor, 2 Howard, 319, it was decided that an act of Congress requiring patents to be issued to persons, “whose claims are contained in the report transmitted to the secretary of the treasury, and-which have been reported favorably on by said commissioners; and such persons are hereby confirmed in their claims, agreeably to any surveys heretofore made, or the lines and boundaries established by the claimants respectively,” vested the legal estate presently in the confirmees. The Court said: “but the title became a legal one by its confirmation by the act of Congress of February, 1823, which was equivalent to a patent. It was higher evidence of title, as it was the direct grant of the fee which had been in the United States by the government itself, whereas the patent was only the act of its ministerial officers.” In Strother v. Lucas, 12 Peters, 410, the Court remark: “ That a grant may be made by a law, as well as a patent pursuant to a law, is undoubted; and a confirmation by a law, is as fully to all intents and purposes a grant, as if it contained in terms a grant de novo.” The act of the 3d of March, 1823, provides : “ That there is hereby granted to each of the French and Canadian inhabitants and other settlers in the village of Peoria, in the State of Illinois, whose claims are contained in a report made by the register of the land office at Edwardsville, in pursuance of the act of Congress, approved May the fifteenth, one thousand eight hundred and twenty, and who had settled a lot in the village aforesaid, prior to the first day of January, one thousand eight hundred and thirteen, and who have not hereto - fore received a confirmation of claims, or donation of any tract of land or village lot from the United States, the lot so settled upon and improved.” This portion of the act contains words of present grant, and in connection with the further provision , directing the lots to be surveyed, manifests a clear intention on the part of Congress, to vest the title absolutely in the claimants on the completion of the survey. Patents were required to be issued not for the purpose of transferring the fee, but merely as evidence that the title had passed to the patentees. The provision in the ordinance of 1818, that all lands sold by the United States within this State, should be exempt from taxation for the term of five years from the sale, did not apply to the claims' in question. The lots were not sold by the United States. They were granted as a bounty to the settlers. We hold that the premises in controversy were taxable in 1845, and that the Circuit Court erred in excluding the evidence offered by the defendant of the sale for taxes. The judgment is reversed, and the cause remanded. Judgment reversed.